**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**July 1, 2004**

**Charles R. Fulbruge III**
**Clerk**

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 02-30188

_____

CHERYL MAYEAUX, RAYMOND GERMAIN,
and DR. AND MRS. EDWARD S. HYMAN,

                                        Plaintiffs-Appellants,

versus

LOUISIANA HEALTH SERVICE AND
INDEMNITY COMPANY (d/b/a BLUE CROSS
& BLUE SHIELD OF LOUISIANA),

                                        Defendant-Appellee.

_____

Appeal from the United States District Court
for the Eastern District of Louisiana
_____

Before DAVIS, WIENER, and STEWART, Circuit Judges.

WIENER, Circuit Judge:

    Cheryl Mayeaux, her husband Raymond Germain, and her treating physician and his wife, Dr. and Mrs. Edward S. Hyman (collectively the "Plaintiffs") sued Louisiana Health Services and Indemnity Company, d/b/a Blue Cross and Blue Shield of Louisiana ("BCBS"). The Plaintiffs asserted various causes of action alleged to have arisen from BCBS's denial of insurance coverage for the costs of Dr. Hyman's treatment of Mayeaux's illness with high doses of antibiotics. After several years of litigation, the Plaintiffs

sought leave to amend and supplement their complaint for a third time in an apparent attempt to defeat federal subject matter jurisdiction. The district court denied the Plaintiffs' motion for leave to amend and subsequently entered summary judgment against the Plaintiffs on all their claims. On appeal, the Plaintiffs contest the district court's denial of their motion for leave to amend and, in the alternative, the district court's grant of summary judgment in favor of BCBS. We affirm.

## I. FACTS AND PROCEEDINGS

A. BACKGROUND

In 1982, Mayeaux went to work for Coleman E. Adler & Sons ("Adler"). The following year, she sought medical treatment from Dr. Hyman who diagnosed Mayeaux as having a connective tissue illness that he calls "systemic coccal disease" ("SCD"). Dr. Hyman treated Mayeux's condition with a so-called "High Dose Antibiotic Treatment" ("HDAT"). In December 1993, BCBS began providing group health insurance coverage for Adler's employees under a comprehensive medical benefit plan (the "Adler Plan"). BCBS denied coverage for Mayeaux's HDAT, stating that it was excluded under the terms of the Adler Plan as experimental or investigational.[1]

The Adler Plan expressly excludes benefits for "[s]ervices or supplies which are Investigational in nature" and defines

---

[1] BCBS's decision was the result of a utilization review by BCBS's Physician Advisory Council, a ten-physician board that examined Dr. Hyman's office notes, the claim form submitted by him, and his description of the prescribed therapy.

"Investigational" as "the use of any treatment, procedure, facility, equipment, drug device or supply not accepted, as determined by [BCBS], as standard medical treatment of the condition being tested, or any such items requiring federal or other governmental agency approval not granted at the time services were rendered." BCBS maintains that its decision to deny coverage for HDAT was purely a question of plan coverage and was not based on any determination regarding the medical appropriateness of Dr. Hyman's procedures.

In April 1995, Mayeaux asked BCBS to reconsider its coverage decision, but BCBS refused. Counsel for the parties exchanged a series of letters in which Mayeaux's lawyer challenged BCBS's refusal to cover the HDAT. At one point in that exchange, counsel for BCBS invited Mayeaux to obtain a second medical opinion in support of the HDAT therapy. Mayeaux submitted an opinion from Dr. Quentin Deming that concurred with Dr. Hyman's prescribed treatment, but BCBS continued to deny coverage.

B. COURT PROCEEDINGS

In 1995, the Plaintiffs filed suit in Louisiana state court seeking damages allegedly resulting from BCBS's failure to pay for Mayeaux's HDAT, as well as bad faith and fraud. BCBS removed the case to federal court invoking federal subject matter jurisdiction because Mayeaux was asserting, inter alia, a claim for benefits under an ERISA-governed plan. The district court allowed the Plaintiffs to amend their complaint to seek a declaratory judgment

3

of Mayeaux's right to receive future benefits under the Adler Plan. Protracted discovery ensued.

In 1997, over BCBS's objection, the district court permitted the Plaintiffs to supplement and amend their complaint a second time to add state law causes of action for unfair trade practices, intentional interference with contract, and defamation. Discovery continued until April 1998, when the district court closed the case administratively until we ruled on two appeals that were pending.[2] In February 2001, the Plaintiffs filed a motion to reopen this case, and shortly thereafter moved, for a third time, to supplement and amend their complaint. This time, the Plaintiffs proposed to dismiss Mrs. Hyman as a plaintiff and to add BCBS Medical Director, Dr. James Gengelbach, as a defendant. In the proposed amendment, the Plaintiffs alleged that Dr. Gengelbach (1) breached his duty of

---

[2] These cases were Moore v. Ashland Chem., 151 F.3d 269 (5th Cir. 1998) (en banc) and Pick v. Am. Med. Sys., Inc., 198 F.3d 241 (5th Cir. 1999) (unpublished). In Moore, we effectively affirmed a district court's exclusion of a physician's opinion on the causal relationship between the plaintiff's exposure to industrial chemicals and his pulmonary illness. 151 F.3d at 279.

Likewise, in Pick, we ultimately concluded that Dr. Hyman's "inability to objectively demonstrate his method's accuracy," slip op. at 2, 6, supported the exclusion of his medical diagnosis that a patient suffered from SCD. We also affirmed the Daubert exclusion of Dr. Hyman's opinion testimony that the defendant's penile prosthesis could cause SCD. Id. at 2, 7. We further held that the district court could exclude Dr. Deming's opinion that the plaintiff suffered from SCD, because Dr. Deming reached his conclusion by examining medical slides prepared using Dr. Hyman's "scientifically unreliable" method. Id. at 7. See Pick v. Am. Med. Sys., Inc., 958 F. Supp. 1151, 1174-79 (E.D. La. 1997).

4

care under Louisiana state law, (2) conspired to retaliate against Dr. Hyman, (3) committed unethical practices, and (4) intentionally caused Mayeaux injury. The Plaintiffs further alleged that BCBS (1) was liable for Dr. Gengelbach's actions under the theory of respondeat superior, (2) breached an implied warranty, and (3) breached its duty of good faith and fair dealing. Importantly, in their proposed amended complaint, the Plaintiffs specifically disavowed any claim against BCBS for denial of benefits. The magistrate judge denied leave to amend; and, on review of the magistrate judge's order, the district court affirmed.

BCBS filed three separate summary judgment motions regarding the Plaintiffs' state and federal causes of action. Relying on ERISA preemption, the district court granted summary judgment to BCBS on all the Hymans' claims. The district court also ruled that Mayeaux's denial-of-benefits claim was governed by ERISA and that there was no genuine issue of material fact regarding whether BCBS abused its discretion in denying coverage. The district court therefore granted summary judgment in favor of BCBS and dismissed the remainder of Mayeaux's state law claims as preempted. The Plaintiffs timely filed their notice of appeal.

## II. ANALYSIS

A. STANDARD OF REVIEW

We review the district court's denial of leave to amend a complaint under Federal Rule of Civil Procedure 15 for abuse of

discretion.[3]   Because of the liberal pleading presumption underlying Rule 15(a), we have acknowledged that the term "discretion" in this context "may be misleading, because FED. R. CIV. P. 15(a) evinces a bias in favor of granting leave to amend."[4] As a result, absent a "substantial reason" such as undue delay, bad faith, dilatory motive, repeated failures to cure deficiencies, or undue prejudice to the opposing party,[5] "the discretion of the district court is not broad enough to permit denial."[6]   Stated differently, district courts must entertain a presumption in favor of granting parties leave to amend.

We review a district court's grant of summary judgment de novo.[7] Summary judgment is appropriate when, viewing the evidence and all justifiable inferences in the light most favorable to the non-moving party, there is no genuine issue of material fact, and

---

[3] Lowrey v. Texas A & M Univ. Sys., 117 F.3d 242, 245 (5th Cir. 1997).

[4] Stripling v. Jordan Prod. Co., LLC, 234 F.3d 863, 872 (5th Cir. 2000) (internal quotations and citations omitted).

[5] This oft-cited list of justifications was pronounced by the Supreme Court in Foman v. Davis, 371 U.S. 178, 182, 83 S. Ct. 227, 230 (1962).

[6] Martin's Herend Imports, Inc. v. Diamond & Gem Trading United States of America Co., 195 F.3d 765, 770 (5th Cir. 1999); Stripling, 234 F.3d at 872.

[7] Hodges v. Delta Airlines, Inc., 44 F.3d 334, 335 (5th Cir. 1995) (en banc).

the moving party is entitled to judgment as a matter of law.[8]  If the moving party meets its burden, the non-movant must designate specific facts showing there is a genuine issue for trial.[9]

B.    DENIAL OF THE PLAINTIFFS' THIRD ATTEMPT TO AMEND

In March 2001, the district court entered a preliminary pretrial conference order that gave the parties thirty days in which to file any final amendments.  Within the prescribed period, the Plaintiffs filed a motion for leave to supplement and amend their complaint for a third time (the district court had allowed two previous amendments).  Because the Plaintiffs' filing was considered to be somewhat incoherent, the magistrate judge ordered the Plaintiffs "to provide opposing counsel with a comprehensive pleading that they propose to file," and offered BCBS an opportunity to submit a supplemental opposition.  In response, the Plaintiffs filed what they styled as a "Restated Complaint."

BCBS opposed this third amendment on two principal grounds. First, BCBS asserted that the Plaintiffs' amendment would be unfairly prejudicial because it would radically change the nature of the litigation after extensive discovery and pretrial activity, and only five months before the case was scheduled for trial. Second, BCBS argued that leave to amend should be denied as futile

---

[8] Hunt v. Cromartie, 526 U.S. 541, 552, 119 S. Ct. 1545, 1551-52 (1999); FED. R. CIV. P. 56(c).

[9] Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).

7

because the new claims proposed by the Plaintiffs were preempted by ERISA.

In denying the Plaintiffs' motion for leave to amend, the magistrate judge stated that "[t]he state law claims which plaintiff attempts to assert appear to be preempted by ERISA." The magistrate judge further observed that "the claims are not new and should have been brought far earlier than now." The district court affirmed the magistrate judge's ruling, declaring that "[t]he proposed amendment to the complaint is untimely; further, it seeks to add state law claims that are preempted by ERISA."

### 1. Timeliness

The Plaintiffs' motion for leave to amend was filed well within the time prescribed by the trial court in its pretrial conference order. Neither the district court nor the magistrate judge made any express findings that the Plaintiffs acted in bad faith or with a dilatory motive or that BCBS would be prejudiced by the amendment. "The Supreme Court has explicitly disapproved of denying leave to amend without adequate justification."[10] We have consistently expressed our "strong preference for explicit reasons" and "indicated the disfavor with which we view district court denials of amendments without stated reasons."[11] In light of the

---

[10] Lowrey, 117 F.3d at 245 (emphasis added) (citing Foman, 371 U.S. at 182, 83 S. Ct. at 230).

[11] Rhodes v. Amarillo Hosp. Dist., 654 F.2d 1148, 1153-54 (5th Cir. 1981) (emphasis added).

8

presumption in favor of allowing pleading amendments, courts of appeals routinely hold that a district court's failure to provide an adequate explanation to support its denial of leave to amend justifies reversal.[12]

When the reason for the denial is "readily apparent,"[13] however, a district court's failure to explain adequately the basis for its denial "is unfortunate but not fatal to affirmance" if the record reflects "ample and obvious grounds for denying leave to amend."[14] This is such a case. Our examination of the procedural

---

[12] See, e.g., Howey v. United States, 481 F.2d 1187, 1191-92 (9th Cir. 1973) (holding that a district court's conclusory denial of leave to amend was an abuse of discretion); Gootee v. Colt Indus., Inc., 712 F.2d 1057, 1065 n.7 (6th Cir. 1983) (remanding the district court's unexplained denial of leave to amend with instructions to "either allow the amendment or explain the basis upon which it refuses to 'freely' grant it"); Pittston Co. v. United States, 199 F.3d 694, 706 (4th Cir. 1999) (reversing the district court when "in its order denying the motion for leave to amend, [the court] did not indicate that it found any bad faith on Pittston's part and did not identify how it believed the Government might be prejudiced by the late amendment"). See also Duggins v. Steak 'N Shake, Inc., 195 F.3d 828, 834 (6th Cir. 1999) (noting the importance of the need for the district court to give reasons for its decision to deny leave to amend); Doherty v. Davy Songer, Inc., 195 F.3d 919, 928 (7th Cir. 1999) (remanding to the district court for findings of prejudice where the district court failed to articulate its reasons for denying leave to amend).

[13] Dussouy v. Gulf Coast Inv. Corp., 660 F.2d 594, 597 (5th Cir. 1981). See also Foman, 371 U.S. at 182, 83 S. Ct. at 230 (recognizing that the reason for denying leave to amend may be "apparent or declared").

[14] Rhodes, 654 F.2d at 1153-54. Accord Feldman v. Am. Mem'l Life Ins. Co., 196 F.3d 783, 793 (7th Cir. 1999) ("Although the district court did not articulate its basis for decision, denial of a motion to amend pleadings without explanation does not constitute abuse of discretion if the delay and prejudice that

9

history of this action leaves us with a definite and firm conviction that BCBS and Dr. Genegelbach would have suffered undue prejudice if the district court had allowed the Plaintiffs' proposed amendments. It is true that the Plaintiffs motion for leave to amend was not "untimely" in the sense of being filed outside the deadline prescribed in the preliminary pretrial conference order. And, we know that delay alone is an insufficient basis for denial of leave to amend: The delay must be <u>undue</u>, i.e., it must prejudice the nonmoving party or impose unwarranted burdens on the court.[15] The Plaintiffs' motion was certainly "untimely" in light of the procedural history and posture of the case. The district court was obviously concerned that the Plaintiffs had waited until such a late stage in the proceedings before seeking leave to assert these amended claims, which — if granted — would work a massive change in the nature and direction of the case.

2. Fundamental Alteration of the Case

In this context, we must determine whether the proposed amendment (1) was merely proposing alternative legal theories for recovery on the same underlying facts or (2) would fundamentally

---

would result from such amendment was apparent.").

[15] See <u>Dussouy</u>, 660 F.2d at 598 & n.2; <u>Duggins</u>, 195 F.3d at 834; <u>Doherty v. Davy Songer, Inc.</u>, 195 F.3d 919, 922, 927 & n.5 (7th Cir. 1999); <u>Bell v. Allstate Life Ins. Co.</u>, 160 F.3d 452, 454 (8th Cir. 1998); <u>Moore v. City of Paducah</u>, 790 F.2d 557, 562 (6th Cir. 1986).

alter the nature of the case.[16]  Amendments that fall into the former category generally should be permitted, as they advance Rule 15(a)'s policy of promoting litigation on the merits rather than on procedural technicalities.  Amendments that fall into the latter category, however, may be denied if the circumstances warrant.  Here, they clearly do.

The Plaintiffs' so-called "Restated Complaint" — an unabashed attempt to avoid ERISA preemption and defeat federal court jurisdiction — essentially pleaded a <u>fundamentally different</u> case with new causes of action and different parties.  As stated by the Eighth Circuit, "when late tendered amendments involve new theories of recovery and impose additional discovery requirements, courts [of appeal] are less likely to find an abuse of discretion due to the prejudice involved."[17]  In their Restated Complaint, the Plaintiffs were effectively reconstructing the case anew, after it had been pending in the district court for years and was nearing the close of extensive discovery.  Indeed, the Plaintiffs were

---

[16] See <u>Lowrey</u>, 117 F.3d at 246 n.2.

[17] <u>Bell</u>, 160 F.3d at 454.  <u>See</u> <u>also</u> <u>Little v. Liquid Air Corp.</u>, 952 F.2d 841, 846 (5th Cir. 1992) (affirming order denying leave to amend where the amended complaint would have "established an entirely new factual basis for the plaintiffs' claims" and thus "radically altered the nature of trial on the merits"), <u>reinstated in relevant part</u>, 37 F.3d 1069, 1073 & n.8 (5th Cir. 1994) (en banc); <u>Morongo Band of Mission Indians v. Rose</u>, 893 F.2d 1074, 1079 (9th Cir. 1990) ("The new claims set forth in the amended complaint would have greatly altered the nature of the litigation and would have required defendants to have undertaken, at a late hour, an entirely new course of defense.").

proposing to abandon Mayeux's claim for medical benefits under the ERISA Plan —— the claim that had been at the core of the Plaintiffs' case from the outset. We conclude that permitting the amendment would have unduly prejudiced BCBS and Dr. Genegelbach, the new defendant whom the Plaintiffs proposed to add to the suit. The district court, therefore, did not abuse its discretion by denying the Plaintiffs leave to amend.[18]

C.   DISMISSAL OF MAYEAUX'S BENEFITS CLAIM

Mayeaux asserts two reasons why the trial court erred in granting summary judgment dismissing her benefits claim. First, Mayeaux insists that the letter from BCBS's general counsel inviting a second opinion was a contractual offer which, when she accepted it by tendering Dr. Deming's report, created a binding obligation on BCBS's part to provide benefits. Second, Mayeaux challenges BCBS's interpretation of the Adler Plan as precluding coverage for Dr. Hyman's prescribed treatment as investigative.

1.   Letter Contract

Following BCBS's denial of Mayeaux's pre-authorization request, counsel for the parties exchanged a series of letters discussing the basis for BCBS's decision. In one of these letters to Mayeaux's lawyer, BCBS's general counsel stated:

Blue Cross and Blue Shield of Louisiana, as an insurer,

_____

[18] Because we affirm the district court's denial of leave to amend on grounds of undue prejudice to the opposing party, we need not analyze the district court's alternative holding concerning futility.

is not obligated to pay for medical treatment which, in our sole discretion, is not medically appropriate. Further, we are not obligated to pay for the "trial and error" practice of medicine. It may be true that Dr. Hyman's treatment is "good medicine"; however, the manufacturer of the medication states otherwise and the terms of our subscriber contract allow us to deny benefits for this reason. Finally, I would like to make it clear that we are not closed-minded regarding this issue. <u>We have urged our subscriber to seek the advice of another physician and, if that physician agrees that Dr. Hyman's treatment is appropriate, then we will continue to pay claims.</u>[19]

Ignoring everything but the final sentence quoted, Mayeaux argues that this statement was a legal <u>offer</u>, which she <u>accepted</u> by submitting the concurring medical opinion of Dr. Deming. She contends that the effect of the letter was "that the health insurer [BCBS] gave up its discretionary authority to determine whether the benefits were appropriate (medically necessary)."

In granting summary judgment in BCBS's favor, the district court observed that "even if that claim was not preempted by ERISA, counsel's letter attempting amicable settlement of an issue that was clearly headed towards litigation did not create any contractual relationship between the principles [<u>sic</u>] unless those principles [<u>sic</u>] expressly gave the attorney authority to do so." Relying on Article 2997 of the Louisiana Civil Code, which requires a principal to give authority "expressly" before a mandatary (agent) can "enter into a compromise,"[20] the district court

---

[19] Emphasis added.

[20] LA. CIV. CODE ANN. art. 2997(5) (West 1994 & Supp. 2003).

13

concluded that the letter from BCBS's general counsel could create no binding contractual agreement between Mayeaux and BCBS, irrespective of Mayeaux's proffer of Dr. Deming's opinion.

The district court correctly granted summary judgment against Mayeaux on her claim for breach of contract. When BCBS's general counsel sent the subject letter to Mayeaux's attorney, this dispute was plainly heading toward litigation. BCBS had consistently maintained that its denial was based on the express exclusion of investigational treatment from coverage under the Adler Plan. Mayeaux's attempt to create a state contractual obligation by isolating a single sentence out of a single letter from BCBS's lawyer to hers — a letter that was part of an extensive ongoing dialogue between the parties' attorneys — is feckless. Indeed the "four corners" of what Mayeaux would have us deem to be a binding agreement between the parties would necessarily encompass the whole chain of correspondence between their respective counsel; and Article 2050 of the Louisiana Civil Code requires that "[e]ach provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole."[21]

In light of the whole exchange, BCBS's lawyer's statement was nothing more than an invitation for Mayeaux to demonstrate that the HDAT was not investigational — that it was, contrary to BCBS's

---

[21] LA. CIV. CODE ANN. art. 2050 (West 1994); see Brown v. Drillers, Inc., 630 So. 2d 741, 748 (La. 1994).

14

position, "standard medical treatment" generally accepted by the wider medical community. On summary judgment, Mayeaux adduced no evidence to illustrate an intention by BCBS to relinquish its discretionary authority to determine what constitutes standard medical treatment under the Adler Plan. Mayeaux's attempt to characterize BCBS's letter as an offer inviting her acceptance misses the mark.[22]

2.   Plan Administrator's Denial of Benefits

Mayeaux also contends that the Adler Plan's administrator improperly denied coverage for Dr. Hyman's prescribed therapy and that the district court erroneously affirmed that decision. We disagree.

As a preliminary matter, Mayeaux advances that the district court failed to apply the correct standard of review. Mayeaux maintains that the Adler Plan administrator's decision is tainted by a conflict of interest, requiring the district court to employ our Vega case's "sliding scale" standard of review to evaluate whether there was an abuse of discretion.[23] Mayeaux's assertion in this regard is baseless: The record makes clear that the district

---

[22] Cf. Anthony v. Liberty Mut. Ins. Co., 759 So. 2d 910, 914 (La. App. 3d Cir. 2000).

[23] See Vega v. Nat'l Life Ins. Svcs. Inc., 188 F.3d 287, 299 (5th Cir. 1999) (en banc); Gooden v. Provident Life & Accident Ins. Co., 250 F.3d 329, 333 (5th Cir. 2001). We have made no independent factual determination concerning whether the Adler Plan's administrator was, in fact, tainted by a conflict of interest.

15

court expressly applied Vega and accorded the administrator's decision less than full deference.

The essence of Mayeaux's substantive challenge to the Adler Plan administrator's decision is that the plan's wording does not contain an express exclusion for the "investigational use of drugs." Mayeaux's argument is a red herring. As we explained earlier,[24] the Adler Plan specifically excludes benefits for investigational treatments and any procedures that BCBS determines not to be "standard medical treatment" for that particular condition.

Simply put, Mayeaux has failed to identify sufficient record evidence on appeal to support the Plaintiffs' contention that HDAT, as prescribed by Dr. Hyman for the connective tissue malady that he diagnosed in Mayeaux, is "standard medical treatment." Mayeaux, of course, relies on Dr. Deming's medical opinion to make this showing. Even assuming arquendo that Dr. Deming's opinion provided some additional support for the Plaintiffs' position that HDAT is not purely investigational, we certainly cannot conclude that the Adler Plan administrator's decision was an abuse of discretion. The administrator could readily have concluded, as he did, that one concurring medical opinion is inadequate to establish that HDAT is a "standard medical treatment." As such, Mayeaux has failed to show abuse of discretion by the administrator of the Adler Plan, so

---

[24] See supra Part I.A.

16

the district court's grant of summary judgment on Mayeaux's denial-of-benefits claim was proper.

D.   THE PLAINTIFFS' STATE LAW CLAIMS

We turn finally to the Plaintiffs' state law claims.  For the reasons stated below, we affirm the district court's grant of summary judgment dismissing these claims.

1.   State Law Tort Claims for Damages

Mayeaux and Germain contend that the district court erred in granting summary judgment dismissing their tort claims for pain and suffering, irreparable connective tissue damage, depression, loss of consortium, loss of earning capacity, lost wages, mental anguish, and attorney's fees.  We agree with the district court's holding that these claims are preempted by ERISA.

Mayeaux and Germain base their insistence that these state law tort claims have not been preempted on the Supreme Court's decision in Pegram v. Herdrich.[25]  There, the Court held that mixed eligibility and treatment decisions that were made by an HMO acting through its physicians were not fiduciary acts under ERISA; and that, as such, those mixed decisions could not give rise to an ERISA breach of fiduciary duty claim.[26]

Pegram carved out a narrow class of state law claims from ERISA conflict preemption.  That carve-out was predicated on the

---

[25] 530 U.S. 211, 120 S. Ct. 2143 (2000).

[26] Id. at 231-37, 120 S. Ct. at 2155-58.

17

defining feature of the HMO scheme as a combination of both insurer and provider of medical services.[27] In the traditional fee-for-service context, treatment decisions are made by the patient's unconflicted physician based exclusively on his medical judgment about the appropriate medical response: In contrast, eligibility decisions are made subsequently by the insurer based on the policy's coverage for a particular condition or medical procedure.[28] When an HMO makes benefits decisions through its physicians, though, the structure of that business model allows for some treatment decisions to converge with eligibility decisions.[29] In that context, such decisions consequently become "mixed" because the eligibility determination cannot, in practical terms, be untangled from physicians' judgments about reasonable medical treatment.[30] As we recognized in Haynes v. Prudential Health Care, "the [Pegram] Court pushed the door ajar to treat mixed eligibility

---

[27] Id. 530 U.S. at 224, 120 S. Ct. at 2152; Rush Prudential HMO, Inc. v. Moran, 536 U.S. 355, 367-70, 122 S. Ct. 2151, 2160-62 (2002).

[28] Pegram, 530 U.S. at 228, 120 S. Ct. at 2154.

[29] See id. at 219-20, 120 S. Ct. at 2149. See also infra text accompanying notes 35-37. We are cognizant that not all HMOs share an identical structure, and we recognize the possibility that the characteristics which make HMOs unique vis-à-vis Pegram's analysis could coalesce in another non-HMO, ERISA-governed insurance model. There is no dispute, however, that BCBS is a not an HMO and no allegation that BCBS has the salient features of a physician-owned-and-operated HMO.

[30] Id. at 229, 120 S. Ct. at 2154. See also infra text accompanying note 37.

18

and treatment decisions as medical decisions for the purposes of ERISA, but it did not sanction the blanket application of mixed eligibility decision in all ERISA preemption cases."[31]  Now, by baldly characterizing BCBS's interpretation of the Adler Plan as a "mixed" decision, Mayeaux and Germain attempt to have us broaden Pegram's carve-out to cover the denial-of-benefits decision at issue here.  This we cannot do because we now know that the Supreme Court rejects such an expansive reading of Pegram.

While this case was pending, the Supreme Court unanimously decided Aetna Health Inc. v. Davila,[32] a consolidated appeal of two law suits by individuals who sued their HMOs for liability under the Texas Health Care Liability Act ("THCLA"), a statute that imposed a duty on health insurance carriers, HMOs, and other entities managing health care plans "to exercise ordinary care when making health care treatment decisions."[33]  In holding that such suits were completely preempted by ERISA, the Court's decision in Davila confirms the extreme narrowness of the scope of the mixed

---

[31] 313 F.3d 330, 335-36 (5th Cir. 2002).  To be sure, in Haynes  we concluded simply that the plaintiff's negligence claims against his HMO were preempted by ERISA because the HMO decision at issue was a pure eligibility decision, only indirectly affecting the medical treatment sought by the plaintiff.  Id. at 337.  We expressed no opinion about whether we read Pegram to carve out all mixed decisions from ERISA preemption.  See id. at 336.

[32] Nos. 02-1845, 03-83, 542 U.S. ___, --- S. Ct. ___, Slip Op. (June 21, 2004).

[33] TEX. CIV. PRAC. & REM. CODE ANN. § 88.002(a).

19

decision carve-out articulated in _Pegram_. _Davila_ explains that "[t]he fact that a benefits determination is infused with medical judgments" does not necessarily convert the plan administrator's decision into a non-fiduciary act.[34] Instead, the indispensable pillar buttressing _Pegram_'s rationale for excluding mixed decisions from being treated as fiduciary acts under ERISA was, as _Davila_ makes clear, the _structure_ of the ERISA plan in question — that is, a physician-owned-and-operated HMO in which "[t]he plaintiff's treating physician was also the person charged with administering plaintiff's benefits."[35] As a result, _Pegram_ has no application outside the HMO context:

> _Pegram_, in highlighting its conclusion that "mixed eligibility decisions" were not fiduciary in nature, contrasted the operation of "[t]raditional trustees administer[ing] a medical trust" and "physicians through whom HMOs act." A traditional medical trust is administered by "paying out money to buy medical care, whereas physicians making mixed eligibility decisions consume the money as well." And, significantly, the Court stated that "[p]rivate trustees do not make treatment judgments." But a trustee managing a medical trust undoubtedly must make administrative decisions that require the exercise of medical judgment.[36]

_Davila_ thus expressly rejects any effort to extend _Pegram_'s mixed-decision principle to cover traditional indemnity insurers like

---

[34] _Davila_, 542 U.S. at ___, --- S. Ct. at ___, Slip Op. at 17.

[35] _Id._ at ___; --- S. Ct. at ___, Slip Op. at 16 (citing _Pegram_, 530 U.S. at 228).

[36] _Id._ at ___; --- S. Ct. at ___, Slip Op. at 17 (quoting _Pegram_, 530 U.S. at 231-232).

BCBS:

> Since administrators making benefits determinations, even determinations based extensively on medical judgments, are ordinarily acting as plan fiduciaries, it was essential to Pegram's conclusion that the decisions challenged there were truly mixed eligibility and treatment decisions, i.e., medical necessity decisions made by the plaintiff's treating physician qua treating physician and qua benefits administrator. Put another way, the reasoning of Pegram only makes sense where the underlying negligence also plausibly constitutes medical maltreatment by a party who can be deemed to be a treating physician or such a physician's employer.[37]

We, therefore, hold that Mayeaux and Germain's state law tort claims are completely preempted by ERISA and affirm the district court's grant of summary judgment in favor of BCBS.

2.   The Remaining State Law Claims

The Plaintiffs also appeal the district court's summary judgment dismissal of the Hymans' state law claims, which were grounded in negligence, unfair trade practices, defamation, and intentional interference with contracts.  We affirm the district court's dismissal of these causes of action via a grant of summary judgment, however, because these remaining claims are indisputably preempted by ordinary conflict preemption under § 514 of ERISA.

ERISA preempts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan."[38]  Although the term "relate to" is intended to be broad, "pre-emption does not

_____

[37] Id. at ___; --- S. Ct. at ___, Slip Op. at 19 (internal quotation marks and citations omitted).

[38] 29 U.S.C. § 1144(a) (2000).

21

occur...if the state law has only a tenuous, remote, or peripheral connection with covered plans, as is the case with many laws of general applicability."[39] If the facts underlying a state law claim bear some relationship to an employee benefit plan, we evaluate the nexus between ERISA and state law in the framework of ERISA's statutory objectives.[40]

Relevant statutory objectives include establishing uniform national safeguards "with respect to the establishment, operation, and administration of [employee benefit] plans," and "establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans."[41] Thus, ERISA preempts a state law claim if a two-prong test is satisfied: (1) The state law claim addresses an area of exclusive federal concern, such as the right to receive benefits under the terms of an ERISA plan; and (2) the claim directly affects the relationships among traditional ERISA entities —— the employer, the plan and its fiduciaries, and the participants and beneficiaries.[42]

We agree with the district court that "Dr. Hyman's claims

---

[39] New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., 514 U.S. 645, 661, 115 S. Ct. 1671, 1680 (1995).

[40] Id. at 656, 115 S. Ct. at 1677.

[41] 29 U.S.C. § 1001(a), (b) (2000).

[42] Smith v. Texas Children's Hosp., 84 F.3d 152, 155 (5th Cir. 1996); Hubbard v. Blue Cross & Blue Shield Ass'n, 42 F.3d 942, 945 (5th Cir. 1995).

relate to an ERISA plan because they challenge [BCBS]'s handling, review, and disposition of a request for coverage. The purpose of these proceedings is to collaterally attack [BCBS's] determination of the actual obligations under the terms of the insurance policy." This reasoning is sound: If a medical practitioner could collaterally challenge a plan's decision not to provide benefits, he would directly affect the relationship between the plan and its beneficiary, two traditional ERISA entities. That clearly cannot be allowed, so Dr. Hyman's negligence and unfair trade practice claims cannot survive ERISA conflict preemption.

Dr. Hyman's state law claims for interference with contract and defamation also fail the conflict preemption test. To allow a medical practitioner to sue for defamation and intentional interference when an ERISA plan administrator decides that the plan does not cover a particular medical treatment for a particular participant or beneficiary would undoubtedly jeopardize the relationships among the traditional ERISA entities, of which the treating physician is not one. These are the sort of claims that go to the very heart of the ERISA administration process. We further agree with the district court that "[e]ven though these claims are labeled by Plaintiffs as state law, the claims arose from the manner in which [BCBS] determined not to cover Hyman's high dosage antibiotic treatments and the subsequent notification

23

to patients that HDAT would not be covered under the Adler Plan."[43] Thus, we have no difficulty holding that "the existence of an [ERISA] plan is a critical factor in establishing liability" for the state law causes of action asserted by Dr. Hyman.[44] We conclude that, as such, they are conflict preempted.

### III.  CONCLUSION

The district court's denial of the Plaintiffs' third motion for leave to amend their complaint was not an abuse of discretion. The motion was untimely in the sense of coming so far into the progress of the case and so close to the scheduled commencement of trial.  Permitting the amendment would have been unfairly prejudicial to BCBS and Dr. Gengelbach by effecting so profound a shift in the nature of the suit.  And, the district court's grant of summary judgment to BCBS on the Plaintiffs' ERISA and state law claims was clearly proper and free of reversible error.  The judgments and orders of the district court are, in all respects, AFFIRMED.

---

[43] See Davila, 542 U.S. at ___; --- S. Ct. at ___, Slip Op. at 12 (holding that the particular label affixed to a cause of action does not affect whether the claim is preempted).

[44] Ingersoll-Rand Co. v. McClendon, 498 U.S. 133, 139-40, 111 S. Ct. 478, 483 (1990).