# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

August 14, 2013

No. 12-10978

Lyle W. Cayce
Clerk

FRANKIE SIMS, on behalf of himself and all others similarly situated; PATSY SIMS, on behalf of herself and all others similarly situated,

Plaintiffs–Appellants,

v.

CARRINGTON MORTGAGE SERVICES, L.L.C.,

Defendant–Appellee.

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 4:12-CV-87

Before OWEN and HAYNES, Circuit Judges, and LEMELLE,[*] District Judge.

PER CURIAM:[**]

Frankie and Patsy Sims (the Simses) appeal the dismissal of their complaint against Carrington Mortgage Services, L.L.C. (CMS), as well as the district court's refusal to allow the Simses to amend their complaint to add additional legal theories and its denial of their motion for reconsideration. We affirm the district court's denial of leave to amend and its denial of the motion

---

[*] District Judge of the Eastern District of Louisiana, sitting by designation.

[**] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 12-10978

for reconsideration. Because the remaining issues in this case raise important and determinative questions of Texas law as to which there are no controlling Supreme Court of Texas precedents, we certify those unresolved questions to the Supreme Court of Texas.

We first address the Simses' motion for leave to amend and their motion for reconsideration. The relevant facts are as follows. The Simses filed a class action lawsuit against CMS in federal district court, alleging that during the course of modifying their home equity loan, CMS violated several provisions of section 50 of Article XVI of the Texas Constitution. CMS filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), arguing that the Simses had not stated a claim. After CMS filed its motion to dismiss, the Simses filed a response that included a request for leave to amend their complaint; they did not file a proposed amended complaint as required under the local rules.[1] The Simses later filed a motion for leave to file a sur-reply to argue new legal theories or, in the alternative, for leave to amend their complaint; that motion set forth the Simses' new theory—namely, that CMS had capitalized not only past-due interest but also past-due property taxes and insurance premiums. In its response, CMS pointed out that the Simses' complaint already contemplated that property taxes and insurance premiums were capitalized along with past-due interest and that CMS's motion to dismiss addressed those claims. Noting that it had "considered all of the parties' filings, as well as the applicable legal authorities," the district court granted the motion and dismissed the Simses' claims with prejudice. The Simses moved for reconsideration, arguing that the district court had not considered their new legal arguments; the district court denied that motion.

---

[1] N. Dist. Tex. Civ. R. 15.1.

2

No. 12-10978

The Simses contend that the district court erred in (1) dismissing the case without allowing them to amend their complaint to add additional theories of liability, and (2) refusing to reconsider the dismissal. We hold that the district court did not abuse its discretion in denying the Simses leave to amend or in refusing to reconsider the dismissal.

"We review the district court's denial of a leave to amend for abuse of discretion."[2] The district court never expressly ruled on the Simses' motion to amend; however, we have held that "[t]he denial of a motion by the district court, although not formally expressed, may be *implied* by the entry of a final judgment or of an order inconsistent with the granting of the relief sought by the motion."[3] Here, the district court's dismissal of the Simses' claims with prejudice was sufficiently inconsistent with the Simses' motion to amend that it constituted an implicit denial of that motion.

Although Federal Rule of Civil Procedure 15(a) "requires a trial court to grant leave to amend freely, and the language of this rule evinces a bias in favor of granting leave to amend," we have emphasized that whether to grant or deny a motion to amend is "entrusted to the sound discretion of the district court."[4] Because the district court did not formally deny the motion to amend, it did not provide any reasoning.[5] A district court, however, may properly deny a motion

---

[2] *Jones v. Robinson Prop. Grp.*, 427 F.3d 987, 992 (5th Cir. 2005) (citing *Schiller v. Physicians Res. Grp. Inc.*, 342 F.3d 563, 566 (5th Cir. 2003)).

[3] *Norman v. Apache Corp.*, 19 F.3d 1017, 1021 (5th Cir. 1994) (citing *Addington v. Farmer's Elevator Mut. Ins. Co.*, 650 F.2d 663, 666 (5th Cir. 1981)).

[4] *Jones*, 427 F.3d at 994 (quoting *Lyn–Lea Travel Corp. v. Am. Airlines*, 283 F.3d 282, 286 (5th Cir. 2002); *Quintanilla v. Tex. Television, Inc.*, 139 F.3d 494, 499 (5th Cir. 1998)) (internal quotation marks omitted).

[5] *See Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*, 497 F.3d 546, 556 (5th Cir. 2007) ("When the reason for the denial is readily apparent, however, a district court's failure to explain adequately the basis for its denial is unfortunate but not fatal to affirmance if the record reflects ample and obvious grounds for denying leave to amend." (quoting

No. 12-10978

to amend when the amendment would be futile.[6] As CMS points out, the Simses' first amended complaint expressly contemplated that other fees and costs may have been capitalized in addition to past-due interest. Additionally, CMS discussed these fees and costs in its brief supporting its motion to dismiss. Therefore, the Simses' allegedly "new" legal theory was already before the district court. The Simses have failed to establish that the district court abused its discretion in denying their motion for leave to amend.

Similarly, we review a district court's denial of a motion to reconsider for abuse of discretion.[7] The Simses argue that the district court should have granted their motion to reconsider for essentially the same reasons that they argue that the court should have granted their motion to amend. For the reasons we have already stated, the district court did not abuse its discretion.

The remaining issues in this case implicate important and determinative, but unresolved, questions of Texas law; we therefore certify those questions to the Supreme Court of Texas.

> CERTIFICATION FROM THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT TO THE SUPREME COURT OF TEXAS, PURSUANT TO ARTICLE 5, SECTION 3-C OF THE TEXAS CONSTITUTION AND RULE 58 OF THE TEXAS RULES OF APPELLATE PROCEDURE.

> TO THE SUPREME COURT OF TEXAS AND THE HONORABLE JUSTICES THEREOF:

## I.  STYLE OF THE CASE

The style of the case is *Frankie Sims, on behalf of himself and all others similarly situated, Patsy Sims, on behalf of herself and all others similarly*

---

*Mayeaux v. La. Health Serv. & Indem. Co.*, 376 F.3d 420, 426 (5th Cir. 2004)) (internal quotation marks omitted)).

[6] *Avatar Exploration, Inc. v. Chevron, U.S.A., Inc.*, 933 F.2d 314, 321 (5th Cir. 1991).

[7] *Fletcher v. Apfel*, 210 F.3d 510, 512 (5th Cir. 2000).

*situated, Plaintiffs–Appellants v. Carrington Mortgage Services, L.L.C., Defendant–Appellee*, Case No. 12-10978, in the United States Court of Appeals for the Fifth Circuit, on appeal from the judgment of the United States District Court for the Northern District of Texas, Fort Worth Division.    Federal jurisdiction is based on diversity of citizenship.[8]

## II.  STATEMENT OF THE CASE

As we have already noted, this case involves a class action filed by the Simses against CMS, in which the Simses contend that CMS violated various provisions of section 50 of Article XVI of the Texas Constitution.    The facts alleged by the Simses are as follows.    In 2003, the Simses obtained a home equity loan from CMS for $76,000.    In 2009, the Simses were behind on their payments and entered into an agreement (the 2009 Agreement) with CMS which added approximately $2,200 of past-due interest and other charges, including fees and unpaid property taxes and insurance premiums, to the principal of the loan, leading to a new balance of $74,345.50.    At that time, the Simses' property was appraised for $72,300.    The 2009 Agreement was entitled "Loan Modification Agreement," purported to be a modification, and contained the following condition:

> All covenants, agreements, stipulations, and conditions in your Note and Mortgage will remain in full force and effect, except as modified herein, and none of your obligations or liabilities under your Note

---

[8] The Simses' complaint alleged federal diversity jurisdiction under the Class Action Fairness Act (CAFA).  28 U.S.C. § 1332(d).  The Simses pleaded the necessary jurisdictional facts for CAFA jurisdiction and filed a motion for class certification, but the district court granted CMS's motion to dismiss before ruling on the motion to certify.  Our sister circuits have held that "federal jurisdiction under the Class Action Fairness Act does not depend on certification." *Cunningham Charter Corp. v. Learjet, Inc.*, 592 F.3d 805, 806 (7th Cir. 2010); *see also Buetow v. A.L.S. Enters., Inc.*, 650 F.3d 1178, 1182 n.2 (8th Cir. 2011); *Metz v. Unizan Bank*, 649 F.3d 492, 500 (6th Cir. 2011); *United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union v. Shell Oil Co.*, 602 F.3d 1087, 1091-92 (9th Cir. 2010); *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1268 n.12 (11th Cir. 2009).  We need not decide whether we have jurisdiction under CAFA, however, because the Simses' individual claims against CMS satisfy the requirements for diversity jurisdiction.  28 U.S.C. § 1332(a).

No. 12-10978

and Mortgage will be diminished or released by any provisions hereof, nor will this Agreement in any way impair, diminish, or affect [the] rights under or remedies on your Note and Mortgage.

In 2011, the Simses again fell behind in their payments, and CMS filed an expedited foreclosure proceeding in state court. The Simses filed for a continuance of the foreclosure proceeding, claiming that the 2009 Agreement violated section 50. The Simses and CMS subsequently entered into another agreement (the 2011 Agreement and, collectively with the 2009 Agreement, the Agreements), which again added approximately $7,368.44 of past-due interest, fees, property taxes, and insurance premiums to the principal of the loan, resulting in a new principal balance of $80,023.95. At the time of the 2011 Agreement, CMS estimated that the value of the Simses' property was $76,100, and the property was appraised at $73,000. Similar to the 2009 Agreement, the 2011 Agreement was entitled "Loan Modification Agreement," purported to modify the existing loan, and contained the following condition:

[A]ll terms and provisions of the Loan Documents, except as expressly modified by this Agreement, remain in full force and effect; nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the obligations contained in the Loan Documents; and [] except as otherwise specifically provided in, and expressly modified by, this Agreement, the Lender and you will be bound by, and will comply with, all of the terms and conditions of the Loan Documents.

In 2012, the Simses filed this lawsuit against CMS alleging that the Agreements violated section 50 and that CMS had committed similar violations with respect to other debtors. CMS filed a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss for failure to state a claim. The district court granted the motion to dismiss, holding that (1) the Agreements were modifications rather than refinances of the loan; (2) capitalizing past-due interest and adding it to the principal does not constitute an "advance of additional funds" under Texas law; (3) section 50(a)(6)(B)'s requirement that a home equity loan not exceed 80% of

6

the value of the home applies only as of the date the original extension of credit was made and not to any subsequent modifications; and (4) the Agreements did not create an open-end account. Accordingly, the district court held that the Simses had not stated a claim and dismissed their claims with prejudice. This appeal followed.

## III.  LEGAL ISSUES

This case involves issues of first impression regarding restrictions placed on home equity lending under article XVI, section 50 of the Texas Constitution. In 1997, Texas became the last state in the nation to permit home equity loans when it passed an amendment to section 50 allowing home equity loans secured by a mortgage on the homestead.[9] "The amendment's purpose was to expand the types of liens for loans that a lender, with the homeowner's consent, could place against a homestead. The amendment allows homeowners who have either entirely repaid their home loans or who have accumulated equity in their homestead over and above existing liens to apply for a loan against that equity."[10] "Although home-equity lending is now constitutionally permissible, [section 50(a)(6)] still places a number of limitations on such lending."[11] "[F]or lenders, section 50 prescribe[s] a Draconian consequence of noncompliance, whether intentional or inadvertent: not merely the loss of the right of forced sale of the homestead, but forfeiture of all principal and interest."[12] The constitution, however, does allow lenders to cure violations within 60 days of notice of the

---

[9] TEX. CONST. art. XVI, § 50(a)(6); *LaSalle Bank Nat'l Ass'n v. White*, 246 S.W.3d 616, 618 (Tex. 2007) (per curiam).

[10] *Stringer v. Cendant Mortg. Corp.*, 23 S.W.3d 353, 354 (Tex. 2000).

[11] *LaSalle Bank*, 246 S.W.3d at 618; *see also* TEX. CONST. art. XVI, § 50(a)(6)(A)-(Q).

[12] *Finance Comm'n of Tex. v. Norwood*, No. 10-0121, 2013 WL 3119481, at *2 (Tex. June 21, 2013); *see also* TEX. CONST. art. XVI, § 50(a)(6)(Q)(x), (c).

violation.[13] It also contains a safe harbor provision, which provides that "[a]n act or omission does not violate" section 50 if it "conforms to an interpretation of the provision" that was "in effect at the time of the act or omission" and was "made by a state agency to which the power of interpretation is delegated . . . or by an appellate court of this state or the United States."[14]

Two Texas agencies, the Finance Commission of Texas and the Credit Union Commission of Texas (the Commissions), have interpretative authority over the home equity provisions in the constitution and have promulgated regulations (the Regulations) pursuant to that authority.[15] Recently, in *Finance Commission of Texas v. Norwood*,[16] the Supreme Court of Texas held that the Regulations are owed the same amount of deference as decisions of Texas courts of appeals.[17] That is, the Supreme Court of Texas reviews the Regulations de novo,[18] while this court would defer to the Regulations "unless convinced by other persuasive data that the [Supreme Court of Texas] would decide otherwise."[19]

Given the Supreme Court of Texas's de novo review of the Regulations at issue, the novel questions of Texas constitutional law presented, the importance

---

[13] TEX. CONST. art. XVI, § 50(a)(6)(Q)(x).

[14] *Id.* art. XVI, § 50(u).

[15] *See id.*; TEX. FIN. CODE ANN. §§ 11.308, 15.413 (West 2013); 7 TEX. ADMIN. CODE §§ 153.1-.96 (Thomson Reuters 2013).

[16] No. 10-0121, 2013 WL 3119481 (Tex. June 21, 2013).

[17] *Norwood*, 2013 WL 3119481, at *10.

[18] *Id.* at *10-11.

[19] *Cerda v. 2004-EQR1 L.L.C.*, 612 F.3d 781, 794 (5th Cir. 2010) (citing *Mem'l Hermann Healthcare Sys. Inc. v. Eurocopter Deutschland, GmbH*, 524 F.3d 676, 678 (5th Cir. 2008)) (internal quotation marks omitted).

traditionally placed on the homestead in Texas law,[20] and the harsh penalties imposed for violations of section 50, we conclude that the remaining questions in this case are best addressed by the Supreme Court of Texas.

## A

The first issue is whether the Agreements constituted modifications or refinances of the Simses' loan. The district court held that the plain language of the Agreements "show[ed] no intention by the parties to satisfy and replace the note," and therefore that the Agreements were modifications rather than refinances. The Simses argue that this interpretation elevates form over substance because "the modification [was] in substance a new note even if the parties tried to agree it was not." They point out that both agreements recite "a new increased principal, a term of years, and an interest rate," and that they "consume[] more home equity as collateral."

Section 50 requires a refinance to independently comply with all of the provisions of subsection (a)(6).[21] Modifications, on the other hand, are a creation of the Regulations, and the Regulations provide that "[t]he home equity requirements of Section 50(a)(6) will be applied to the original loan and the subsequent modification as a single transaction."[22]

Despite the important implications of classifying a transaction as a modification or a refinance, the distinction between the two is not clear under Texas law. The Regulations define a modification as a transaction in which "one or more terms of an existing equity loan is modified, but the note is not satisfied

---

[20] *See, e.g.*, *LaSalle Bank*, 246 S.W.3d at 618 ("For over 175 years, Texas has carefully protected the family homestead from foreclosure by limiting the types of liens that can be placed upon homestead property.").

[21] TEX. CONST. art. XVI, § 50(f).

[22] 7 TEX. ADMIN. CODE § 153.14(2) (Thomson Reuters 2013).

and replaced."[23]   Neither the constitution nor the Regulations clearly define "refinance."   In commentary to proposed rules, the Commissions have opined that "[a] refinance creates a new loan whereas a modification amends the original loan" and that "in a refinance, the lien relates back to the original loan, [but] [i]n a modification, the original lien remains."[24]   The Supreme Court of Texas has not defined "refinance" in the context of section 50, although it has noted, albeit in a different context, that an "ordinary refinance transaction[]" is one "in which an indebtedness is truly being renewed, modified, and extended."[25]

These sources suggest that when the original note is not satisfied and replaced, as in this case, the transaction is a modification rather than a refinance.   But they do not address the limits of such modifications, that is, whether a modification can change the principal amount of the loan without being required to comply with the provisions applicable to refinances.   We therefore certify this question to the Supreme Court of Texas.

**B**

If the Agreements were in fact refinances, the inquiry ends: there is no dispute that the Agreements did not independently comply with subsection (a)(6) as is required for refinances.   However, assuming that the Agreements were modifications rather than refinances, additional questions arise.

The first of these questions is whether the capitalization of past due interest, fees, property taxes, or insurance premiums is an "advance of additional funds" under the Regulations.   The Regulations provide that "[t]he advance of additional funds to a borrower is not permitted by modification of an

---

[23] *Id.*

[24] 29 Tex. Reg. 10257 (2004) (to be codified at 7 TEX. ADMIN. CODE §§ 153.91-92, .94 -.96).

[25] *First Nat'l Bank of Kerrville v. O'Dell*, 856 S.W.2d 410, 413 n.3 (Tex. 1993) (discussing the equitable subrogation doctrine).

equity loan."[26] The district court held that "a common-sense reading of the term 'additional funds' would appear to contemplate money provided by the lender to the borrower . . . that the borrower could use for other purposes at his or her discretion."

The Simses argue that the district court erred because the capitalized interest was not an "amount already loaned" to the Simses.  Under this view, when CMS capitalized the past-due interest, it effectively loaned the Simses an additional sum to pay that interest.  According to the Simses, this was an extension of credit not contemplated by the original loan—an "advance of additional funds."  CMS counters that capitalization of the past-due interest cannot constitute an advance of additional funds because it was money already owed to CMS under the "existing, pre-modification home equity loan."

The only case that CMS cites in support of its position, *Meador v. EMC Mortgage Corp*,[27] is not on point.  In *Meador*, debtors who wanted to obtain an unsecured loan from a lender were required to refinance their home mortgage as a condition of obtaining the unsecured loan; however, it was "undisputed that the two loans were independent of one another" and that the homestead lien on the mortgage loan did not cover repayment of the unsecured loan.[28]  The debtors later brought suit, contending that the loan violated section 50(e), which provides that the advance of additional funds cannot be secured by a lien against the homestead unless certain conditions are met.[29]  The court rejected the debtors' position, holding that "'additional funds' are monies obtained in excess

---

[26] 7 TEX. ADMIN. CODE § 153.14(2)(A) (Thomson Reuters 2013).

[27] 236 S.W.3d 451 (Tex. Ct. App.—Amarillo 2007, pet. denied).

[28] *Meador*, 236 S.W.3d at 452.

[29] *Id.*; *see also* TEX. CONST. art. XVI, § 50(e).

of the pre-existing debt being refinanced"[30] and that "the phrase 'advance of additional funds' contemplates additional funds the repayment of which is secured through a [section 50] lien."[31]

Even assuming that "advance of additional funds" has the same meaning in section 50(e) and in the Regulations, it appears that the present case is distinguishable from *Meador*. The alleged "additional funds" in *Meador* were the proceeds of an *unsecured* loan. In this case, the payment of the "additional funds" at issue—that is the capitalized past-due interest—was secured by a section 50 lien.

Whether past-due property taxes or insurance premiums can be capitalized into loan principal presents an additional issue under Texas law. As the Simses point out, such sums were not part of the "undifferentiated 'debt' owed to CMS." Instead, the property taxes and insurance premiums were owed to third-parties by the Simses. CMS argues that the Simses' Security Instrument expressly contemplated capitalization of property taxes and insurance and that if such capitalization were prohibited under section 50, there would be "a monumental change in lending practices."

The Security Instrument provided that in addition to principal and interest payments each month, the Simses would pay a sum for "Escrow Items," including property taxes and insurance premiums. The Security Instrument allowed, but did not obligate, CMS to pay past-due escrow items and to charge the Simses interest on such payments. These sums were thus not actually owed to CMS until CMS paid the past-due property taxes and insurance premiums to third parties. This potentially distinguishes both past-due property taxes and insurance premiums from past-due interest. Whether the Security Instrument

---

[30] *Meador*, 236 S.W.3d at 453.

[31] *Id.*

No. 12-10978

expressly provides for the capitalization that the Simses allege occurred in this case is disputed. The Simses maintain that capitalization of these costs is not permitted under section 50.

The parties have not cited, nor have we found, additional precedent interpreting the phrase "advance of additional funds"; we therefore certify this unresolved issue of Texas law to the Supreme Court of Texas.

## C

The next issue is whether all of the requirements in section 50(a)(6)(A)-(Q) are triggered by a loan modification in which the principal of the loan is increased. The Simses contend that they are and primarily allege that the Agreements violated section 50(a)(6)(B). That subsection requires a home equity loan to be "of a principal amount that when added to the aggregate total of the outstanding principal balances of all other indebtedness secured by valid encumbrances of record against the homestead does not exceed 80 percent of the fair market value of the homestead on the date the extension of credit is made."[32] In other words, it provides that the loan-to-value ratio (LTV ratio) cannot exceed 80%. CMS does not dispute that the LTV ratio of the Simses' loan exceeded 80% after each agreement but contends that the subsection (B) does not apply to the Agreements in the first instance.

The district court held that because the Agreements were modifications rather than refinances, CMS was not required to comply with section 50(a)(6)(B) each time it offered the Simses a modification. The court focused on the language "on the date the extension of credit is made," which is defined in the

---

[32] TEX. CONST. art. XVI, § 50(a)(6)(B); *see also* 7 TEX. ADMIN. CODE § 153.3 (Thomson Reuters 2013) ("An equity loan must be of a principal amount that when added to the aggregate total of the outstanding principal balances of all other indebtedness secured by valid encumbrances of record against the homestead does not exceed 80 percent of the fair market value of the homestead on the date the extension of credit is made.").

13

No. 12-10978

Regulations as the date on which the home equity loan closes,[33] and concluded that this language indicated that the LTV ratio need only be measured at the closing of the initial home equity loan and not after any subsequent modification. However, the district court's reading of subsection (B) is not compelled by its plain text because it is unclear from that text whether the phrase "on the date the extension of credit is made" modifies the entire provision including the "principal amount" of the loan or whether it simply modifies the "fair market value of the homestead." Under the latter interpretation, the fair market value of the home would always be measured as of the closing date of the original home equity loan for purposes of the LTV ratio but the principal amount of the loan would not. Thus, a loan that initially complied with subsection (B) might no longer comply after a modification in which the principal amount of the loan increased.

Neither section 50 nor the Regulations resolves this ambiguity. On one hand, as the district court noted, other provisions of the constitution, including the disclosures mandated by § 50(g),[34] suggest that the LTV ratio is only measured at the inception of the original loan. On the other hand, there are also indications that the LTV ratio should be re-measured if the principal of the loan increases. For example, under the Regulations, "[a] modification of an equity loan may not provide for new terms that would not have been permitted by applicable law at the date of closing of the extension of credit,"[35] which suggests that a modification that causes the LTV ratio to exceed 80% is not permissible.

---

[33] 7 TEX. ADMIN. CODE § 153.1(3), (6)-(7).

[34] TEX. CONST. art. XVI, § 50(g) (requiring, in relevant part, that the lender disclose to the borrower that "THE PRINCIPAL LOAN AMOUNT *AT THE TIME THE LOAN IS MADE* MUST NOT EXCEED AN AMOUNT THAT, WHEN ADDED TO THE PRINCIPAL BALANCES OF ALL OTHER LIENS AGAINST [THE] HOME, IS MORE THAN 80 PERCENT OF THE FAIR MARKET VALUE OF [THE] HOME" (emphasis added)).

[35] 7 TEX. ADMIN. CODE § 153.14(2)(C).

14

Additionally, as the Simses point out, the district court's reading undermines subsection (B), at least in some cases, because so long as a lender and borrower satisfy it at the inception of the loan, they may subsequently enter into a loan modification that renders the LTV ratio well over 80%. Accordingly, we also certify this question.

## D

The final question presented in this appeal is whether the Agreements converted the Simses' loan into an open-end account that was required to comply with section 50(t). The district court rejected this argument, holding that the Simses had not alleged "any facts that could possibly be construed as alleging that the modifications of plaintiffs' home equity loan created any form of open-end account" and that "the loan modification documents clearly contemplate[d] a fixed schedule of payments, for a defined period of time, with a decreasing principal balance following each month's payment."

Section 50(a)(6)(F) prohibits a home equity loan from taking the form of an open-end account unless it qualifies as a home equity line of credit (HELOC).[36] Section 50(t) sets forth requirements for HELOCs,[37] and it is undisputed that the transactions in this case did not meet those requirements. Thus, the only question is whether the transactions created an open-end account that was required to comply with section 50(t). As "open-end account" is not defined by section 50 or by the Regulations, we certify this issue to the Supreme Court of Texas as well.

## IV.  QUESTIONS CERTIFIED

We accordingly certify the following four determinative questions of law to the Supreme Court of Texas:

---

[36] TEX. CONST. art. XVI, § 50(a)(6)(F), (t).

[37] *Id.* art. XVI, § 50(t).

No. 12-10978

1. After an initial extension of credit, if a home equity lender enters into a new agreement with the borrower that capitalizes past-due interest, fees, property taxes, or insurance premiums into the principal of the loan but neither satisfies nor replaces the original note, is the transaction a modification or a refinance for purposes of section 50 of Article XVI of the Texas Constitution?

If the transaction is a modification rather than a refinance, the following questions also arise:

2. Does the capitalization of past-due interest, fees, property taxes, or insurance premiums constitute an impermissible "advance of additional funds" under section 153.14(2)(B) of the Texas Administrative Code?

3. Must such a modification comply with the requirements of section 50(a)(6), including subsection (B), which mandates that a home equity loan have a maximum loan-to-value ratio of 80%?

4. Do repeated modifications like those in this case convert a home equity loan into an open-end account that must comply with section 50(t)?

We disclaim any intention or desire that the Supreme Court of Texas confine its reply to the precise form or scope of the questions certified.

*     *     *

AFFIRMED IN PART and QUESTIONS CERTIFIED.