# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

October 19, 2022

Lyle W. Cayce
Clerk

No. 19-30689

Calvin Lewis,

*Plaintiff—Appellant*,

*versus*

Randy Smith, Individually and In His Official Capacity as Sheriff of St. Tammany Parish,

*Defendant—Appellee*.

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:18-CV-4776

Before Stewart, Dennis, and Haynes, *Circuit Judges*.

Per Curiam:*

Calvin Lewis was terminated from his job as a Captain with the St. Tammany Parish Sheriff's Office ("STPSO") for violating its anti-fraternization policy after a Facebook post alluded to his relationship with a known felon. Lewis brought several constitutional claims against

---

* Pursuant to 5th Circuit Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Circuit Rule 47.5.4.

No. 19-30689

Sheriff Randy Smith, individually and in his official capacity, alleging that his termination violated his right to intimate association and equal protection. He also alleged that the policy was overbroad and vague. The district court dismissed Lewis's claims under Rule 12(b)(6). We affirm.

## I. FACTUAL & PROCEDURAL BACKGROUND

Lewis, who is African American, was an employee of the STPSO from 1997 until his termination in 2017. According to Lewis, he met Jane Doe[1] while he was assigned to a work detail in 2007, and they began dating thereafter. Lewis and Doe, and Doe's two children from a previous relationship, began living together in May 2010. Lewis's relationship with Doe, who had a past felony conviction at the time the two began dating, was open and well known among his colleagues. In January 2017, after having been promoted to Captain, Lewis learned of a Facebook post in which someone commented that "a newly promoted captain" was living with a convicted felon in violation of STPSO policies. Lewis advised Sheriff Smith of the post. Several months later, in May 2017, Lewis was called to a meeting with internal affairs investigators from the STPSO to discuss his relationship with Doe. There, he was informed that if he wanted to continue working for the STPSO, he would be required to disassociate from Doe due to her status as a convicted felon. Lewis refused to do so and consequently, was terminated pursuant to the STPSO's anti-fraternization policy, which prohibits STPSO

---

[1] Lewis uses the name "Jane Doe" for purposes of privacy.

No. 19-30689

personnel from engaging in personal relationships or associations with known felons.[2]

Lewis brought suit under 42 U.S.C. § 1983, alleging that the anti-fraternization policy violated his constitutional rights because (1) as applied to Lewis, the policy infringed on his right to personal association and privacy in his intimate relationships; (2) the policy is facially overbroad and vague; and (3) the policy is selectively enforced in violation of the Due Process Clause of the Fourteenth Amendment.[3] Sheriff Smith moved to dismiss the suit under Federal Rule of Civil Procedure 12(b)(6), arguing that Lewis had failed to state a claim upon which relief could be granted. In his opposition responding to the merits of Sheriff Smith's motion, Lewis stated

---

[2] The policy provides in pertinent part:

FRATERNIZATION

a.  Inappropriate public displays of affection at work.
b.  Romantic or intimate personal or other close relationships between direct supervisors and subordinates.
c.  Romantic or intimate personal or other close relationships between an employee and a known felon, Transitional Work Program inmate, or any incarcerated individual.

***

IMPROPER RELATIONSHIPS BETWEEN DEPUTIES AND INCARCERATED INDIVIDUALS

Fraternization is also the undertaking of a personal relationship or association, with or without a sexual relationship, by a Deputy with a known felon, Work Release person, or any incarcerated individual(s) without the express written permission of the Sheriff, or his designee. This includes any person held in custodial confinement by arrest or imprisonment.

[3] Lewis alleged in his complaint that his selective enforcement claim arose under the Due Process Clause of the Fifth Amendment, but the district court correctly pointed out that such a claim would arise under the Fourteenth Amendment Due Process Clause and analyzed it accordingly. We do the same here.

in a footnote: "[T]o the extent the Court requires additional factual information on these points, Plaintiff respectfully requests leave to amend in order to provide that additional factual information." Later in the opposition, Lewis again noted that, if necessary, he could provide additional facts about the other individuals who had violated the anti-fraternization policy through discovery or an amended complaint.

The district court granted Sheriff Smith's motion and dismissed Lewis's claims with prejudice, reasoning that he had failed to state a plausible claim of a constitutional violation. The district court's order did not address Lewis's statements in his opposition regarding amending his complaint, resulting in an implicit denial of his request to amend. Lewis filed this appeal.

## II. STANDARD OF REVIEW

We conduct a de novo review of the district court's grant of a motion to dismiss. *Bass v. Stryker Corp.*, 669 F.3d 501, 506 (5th Cir. 2012). "All well-pleaded facts are accepted as true and viewed in the light most favorable to the nonmovant." *Id.* (citation omitted). "Dismissal is appropriate when the plaintiff has not alleged enough facts to state a claim to relief that is plausible on its face or has failed to raise his right to relief above the speculative level." *Id.* Denial of leave to amend is generally reviewed for an abuse of discretion. *Schiller v. Physicians Res. Grp. Inc.*, 342 F.3d 563, 566 (5th Cir. 2003).

## III. DISCUSSION

On appeal, Lewis argues that the district court erred in holding that he failed to a state claim for violation of his constitutional right to intimate association. He also re-urges his arguments that the policy is facially overbroad and vague and that it was selectively enforced against him. Last,

he asserts that the district court erred in denying his request for leave to amend his complaint.[4] We address each argument in turn.

"To pursue a claim under [42 U.S.C.] § 1983, a 'plaintiff[ ] must (1) allege a violation of rights secured by the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law[.]'" *Sw. Bell Tel., LP v. City of Houston*, 529 F.3d 257, 260 (5th Cir. 2008) (citation omitted). Section 1983 "confers no substantive rights, but merely provides a remedy for the violation[.]" *Id.*

### A. Right to Intimate Association

"Though not expressly included in the text of the amendment, [i]mplicit in the right to engage in First Amendment-protected activities is a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Mote v. Walthall*, 902 F.3d 500, 506 (5th Cir. 2018) (internal quotation marks and citations omitted). Two classes of associations have been identified by the Supreme Court as being protected by the First Amendment: expressive associations and intimate associations. *Id.* While expressive association emanates from the First Amendment's protections of expression, intimate association primarily derives from the fundamental right to personal liberty and the resulting "freedom to choose 'to enter into and maintain certain intimate human relationships.'" *Kipps v. Caillier*, 205 F.3d 203, 205 (5th Cir. 2000) (quoting *Roberts v. United States Jaycees*, 468 U.S. 609, 617–18 (1984)); *see also Anderson v. City of LaVergne*, 371 F.3d 879, 881 (6th Cir. 2004) ("The

---

[4] Although Lewis lists in his statement of issues that the district court erred in holding that Sheriff Smith was entitled to qualified immunity, he fails to brief an argument on this assignment of error. Consequently, we consider the issue waived and do not address it herein. *See Arnone v. Cnty. of Dall. Cnty.*, 29 F.4th 262, 265 (5th Cir. 2022) ("[F]ailure adequately to brief an issue on appeal constitutes waiver of that argument.").

Constitution protects two distinct types of association: (1) freedom of expressive association, protected by the First Amendment, and (2) freedom of intimate association, a privacy interest derived from the Due Process Clause of the Fourteenth Amendment but also related to the First Amendment."). This court has acknowledged that "family relationships" are "[a]t the foundation of this right to intimate association," because these relationships "by their nature, involve deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life." *Kipps*, 205 F.3d at 205.

Due to the "marriage-like status" of Lewis and Doe's relationship, the district court analyzed Lewis's claim that his constitutional right to intimate association was violated under the jurisprudence applicable to the right of marriage.[5] We do the same here. "The right to marry is both a fundamental substantive due process and associational right." *Montgomery v. Carr*, 101 F.3d 1117, 1124 (6th Cir. 1996) (citing *Loving v. Virginia*, 388 U.S. 1, 12 (1967); *Roberts*, 468 U.S. at 619). In determining the level of scrutiny applicable to governmental action alleged to infringe upon the right of marriage, we employ a two-step analysis: "first, a court must ask whether the policy or action is a direct or substantial interference with the right of marriage; second, if the policy or action is a direct and substantial interference with the right of marriage, apply strict scrutiny, otherwise apply rational basis scrutiny." *Id.*

---

[5] Though Lewis and Doe are not married, Lewis alleges that they have a constitutionally protected relationship because they have cohabited for more than eight years and he is involved in raising her children. Sheriff Smith does not dispute that Lewis's relationship with Doe is constitutionally protected and the district court declined to hold otherwise.

No. 19-30689

Lewis argues that strict scrutiny must be applied to the policy while Sheriff Smith counters that rational basis review applies. The district court agreed with Sheriff Smith and concluded that rational basis scrutiny applies. In doing so, the district court reasoned that the policy "does not place a 'direct and substantial' burden on the right to intimate relationships because it does not completely prohibit one class of people from being with another." In other words, the policy only incidentally affects the right to intimate association because it requires employees who violate the policy to relinquish their jobs but does not prohibit the relationship itself. We agree with this reasoning given that it comports with the Supreme Court's guidance as described in *Montgomery*. *See Montgomery*, 101 F.3d at 1124 ("Two examples of 'direct and substantial' burdens on the right of marriage derive from the facts of *Loving* [6] and *Zablocki*.[7] In *Loving*, the anti-miscegenation statute at issue was a 'direct and substantial' burden on the right of marriage because it absolutely prohibited individuals of different races from marrying. In *Zablocki*, the burden on marriage was 'direct and substantial' because the Wisconsin statute in that case required non-custodial parents, who were obliged to support their minor children, to obtain court permission if they wanted to marry[.]"). Moreover, as the Supreme Court explains in *Zablocki*, not all regulations are "direct and substantial":

> By reaffirming the fundamental character of the right to marry, we do not mean to suggest that every state regulation which relates in any way to the incidents of or prerequisites for marriage must be subjected to rigorous scrutiny. To the contrary, reasonable regulations that do not significantly interfere with decisions to enter into the marital relationship may

---

[6] *Loving v. Virginia*, 388 U.S. 1, 12 (1967).

[7] *Zablocki v. Redhail*, 434 U.S. 374, 388 (1978).

7

> legitimately be imposed. The statutory classification at issue here, however, clearly does interfere directly and substantially with the right to marry . . . When a statutory classification significantly interferes with the exercise of a fundamental right, it cannot be upheld unless it is supported by sufficiently important state interests and is closely tailored to effectuate only those interests.

*Zablocki*, 434 U.S. at 386–87 (citations omitted).

Under the deferential rational basis test, we ask "whether a rational relationship exists between the [policy] and a conceivable legitimate objective." *Simi Inv. Co. v. Harris Cty.*, 236 F.3d 240, 251 (5th Cir. 2000). In this case, the answer is yes. As the district court explained, "[t]he STPSO's legitimate interests in preventing its officers from placing themselves in compromising positions and in preserving the STPSO's reputation in the public and in the law enforcement community are reasonably advanced by the anti- fraternization policy and therefore are sufficient to uphold the policy under the rational basis test." This is especially true for senior officers like Lewis whose conduct reflects on the reputation and integrity of the office. Accordingly, we hold that the district court did not err in holding that Lewis failed to state a claim for violation of his constitutional right to intimate association.

### B. Overbreadth

The Supreme Court has explained that "a law may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *United States v. Stevens*, 559 U.S. 460, 473 (2010) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 n.6 (2008)).

Lewis asserted below, and urges on appeal, that the policy is facially overbroad. The district court determined that Lewis's complaint failed to state a claim of unconstitutional overbreadth because its allegations were "nothing more than formulaic legal conclusions" that were "devoid of any facts." Our review of Lewis's complaint leads us to the same conclusion. Other than stating that the policy is overbroad and for that reason unconstitutional, Lewis has provided no meaningful analysis of this argument. The district court did not err in dismissing Lewis's overbreadth claim.

*C. Vagueness*

This court has explained that "[v]ague statutes violate due process, because laws must 'give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly.'" *Ford Motor Co. v. Tex. Dept. of Transp.*, 264 F.3d 493, 509 (5th Cir. 2001) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)). "A statute is not unconstitutionally vague merely because a company or an individual can raise uncertainty about its application to the facts of their case," but "only where no standard of conduct is outlined at all; when no core of prohibited activity is defined." *Id.* (citation omitted). A law is void for vagueness only if it "commands compliance in terms so vague and indefinite as really to be no rule or standard at all or if it is substantially incomprehensible." *Id.* at 507 (internal quotation marks and citation omitted).

According to Lewis, the policy is vague because it "invite[s] arbitrary enforcement given the way [it is] written." He contends that the policy fails to adequately define its terms and that no standard of conduct is specified. We disagree. The policy is clear in prohibiting close relationships between STPSO employees and felons, by banning "[r]omantic or intimate personal or other close relationships between an employee and a known felon"

including "the undertaking of a personal relationship or association, with or without a sexual relationship, by a Deputy with a known felon." These terms are certainly not "substantially incomprehensible." *Id.* at 507. Moreover, Lewis's vagueness claim carries little weight because the policy clearly applies to his relationship with Doe. *See Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 546 (5th Cir. 2008) ("[A] reviewing court should 'examine the complainant's conduct before analyzing other hypothetical applications of the law' because 'a plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.'" (quoting *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 497 (1982)). For these reasons, we conclude that the district court did not err in dismissing Lewis's vagueness claim.

### D. Selective Enforcement

"[T]o successfully bring a selective prosecution or enforcement claim, a plaintiff must prove that the government official's acts were motivated by improper considerations, such as race, religion, or the desire to prevent the exercise of a constitutional right." *Bryan v. City of Madison*, 213 F.3d 267, 277 (5th Cir. 2000). "[T]he conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation." *Allred's Produce v. U.S. Dep't of Agric.*, 178 F.3d 743, 748 (5th Cir. 1999) (quoting *Oyler v. Boles*, 368 U.S. 448, 456 (1962)). "Rather, it must be shown that the selective enforcement was deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification." *Id.* (internal quotation marks and citation omitted).

Lewis's complaint alleges that several other STPSO employees are engaged in relationships and associations that violate the policy but that these employees were not terminated or disciplined. Lewis also alleges that the "decision to enforce the policy against [him] was arbitrary, motivated by the

desire to prevent [him] from exercising his constitutional rights, and/or because of [his] race (African American)." As the district court points out, however, Lewis's complaint does not describe the types of associations at issue in those other cases, the jobs held by the other STPSO personnel, or any other relevant details. In essence, Lewis has made no factual, non-conclusory allegations that could lead to the conclusion that one motivation for Sheriff Smith's enforcement of the policy against him was either his race or his exercise of a fundamental constitutional right. For these reasons, we conclude that the district court properly dismissed Lewis's selective enforcement claim.

### E. Leave to Amend

Courts examine five considerations in determining "whether to grant a party leave to amend a complaint: (1) undue delay, (2) bad faith or dilatory motive, (3) repeated failure to cure deficiencies by previous amendments, (4) undue prejudice to the opposing party, and (5) futility of the amendment." *Smith v. EMC Corp.*, 393 F.3d 590, 595 (5th Cir. 2004). "A court should freely give leave to amend when justice so requires, FED. R. CIV. P. 15(a)(2), but a movant must give the court at least some notice of what his or her amendments would be and how those amendments would cure the initial complaint's defects." *Scott v. U.S. Bank Nat'l Ass'n*, 16 F.4th 1204, 1209 (5th Cir. 2021). In *Scott*, this court held that a district court does not abuse its discretion in denying a motion to amend when the movant fails to offer any grounds as to why leave should be granted or how deficiencies in his complaint could be corrected. *Id.*

Lewis argued that the district court erred in failing to address his request to amend his complaint. As a preliminary matter, we note that Lewis

No. 19-30689

never filed a motion to amend.[8] Instead, he stated in a footnote in his opposition to Sheriff Smith's motion to dismiss that "to the extent the Court requires additional factual information . . . Plaintiff respectfully requests leave to amend in order to provide that additional factual information." Later in the opposition, Lewis stated:

> To the extent further factual allegations are necessary, such as the identity and race of the other persons that are in violation of the policies but have not been terminated, such information can either be provided to Defendants through discovery . . . or can be supplied to this Court through an Amended Complaint.

Then, toward the end of his opposition, Lewis requested leave to amend citing the general law under Rule 15 that applies when courts consider such requests. *See* FED. R. CIV. P. 15 (a)(2).

Although Lewis articulates an explanation of how Rule 15 applies to leave requests and explains that he can provide additional information if necessary, he failed to provide any facts in the district court that would support his claims if he was granted leave to amend. As a practical matter, Lewis appears to take the position that his pleadings are sufficient but that he can provide more detail if necessary. Because Lewis failed to offer any grounds to the district court as to why leave to amend should be granted or as to how the deficiencies in his complaint could be corrected, we conclude that the district court did not abuse its discretion in implicitly denying his leave request. *See Scott*, 16 F.4th at 1209.

---

[8] As Sheriff Smith points out, the record reflects that he filed the motion to dismiss in July 2018, but the district court did not rule on the motion until over a year later in August 2019. There was ample time for Lewis to file a motion to amend during this time period, but he failed to do so.

No. 19-30689

## IV. CONCLUSION

For the foregoing reasons, the district court's judgment dismissing Lewis's suit is AFFIRMED.

No. 19-30689

JAMES L. DENNIS, *Circuit Judge*, concurring in part and dissenting in part:

Calvin Lewis joined the St. Tammany Parish Sheriff's Office (STPSO) as a reserve deputy in 1997. Over the span of his career, he was promoted several times, ultimately to the rank of captain, and received numerous commendations and positive evaluations along the way— including being awarded Deputy of the Year in 2001 and the Medal of Valor in 2014. In 2007, Lewis began a romantic relationship with Jane Doe. In 2010, Lewis, Doe, and Doe's two children (then 2 and 5 years old) moved in together. Since then, Lewis has raised Doe's children as his own.

In 2017, someone posted on Facebook that "a newly promoted captain" was living with a convicted felon. Doe had a felony conviction from several years prior to the start of her relationship with Lewis. Under the STPSO's fraternization policy, employees are prohibited from maintaining "[r]omantic or intimate personal or other close relationships" with any "known felon, Transitional Work Program inmate, or any incarcerated individual." After reviewing the Facebook post, Lewis immediately notified St. Tammany Parish sheriff Randy Smith. Several months later, Lewis was called into a meeting with one of his superiors and two officials from the STPSO internal affairs department. They gave Lewis a choice: permanently and completely sever all ties with Doe (and with the children he had helped raise), or face termination. He refused to—in his words—"sacrifice his family." He was fired on May 19, 2017.

Lewis brought this action against Sheriff Smith in both his individual and official capacities. He alleges that STPSO's fraternization policy, as applied to his relationship with Doe and her children, violated his constitutional right to intimate association. In addition, Lewis, who is African American, alleges that the policy is selectively enforced. As evidence of this, he claims that Sheriff Smith is himself engaged in an "association"

14

with someone believed to be a convicted felon. Lewis also alleges that "several other current employees" of the STPSO are engaged in relationships or associations that violate policy, but that these employees have not been disciplined or terminated. Lewis stated in response to Smith's motion to dismiss that he could provide the identities and races of these other individuals in an amended complaint.

We must decide whether Lewis plausibly alleged that the STPSO violated his constitutional rights by insisting that he dissociate from Doe, and from the children that he raised with her, as a condition of his continued employment. The majority, applying rational basis review, says that he did not. I believe he has. I would apply heightened scrutiny and reverse the district's courts dismissal of this claim.

Separately, I believe it was an abuse of discretion for the lower court to deny Lewis's motion to amend his complaint. The information he proposed to include in his amended complaint cut to the very heart of his selective-enforcement claim. He should not have been denied the opportunity to present that information.

For those reasons, I dissent in part.[1]

---

[1] I agree with the majority that Lewis's overbreadth and vagueness challenges fail. I also agree that Lewis's selective-enforcement claim, as pleaded, failed to state a claim for relief; however, as noted below, I would reverse the district court's denial of leave to amend the complaint to provide further factual support for this claim. Finally, I agree with Smith that Lewis forfeited any challenge to the district court's dismissal on qualified immunity grounds of his individual-capacity claims.

## I.

"The fundamental liberties protected by [the Due Process] Clause … extend to certain personal choices central to individual dignity and autonomy, including intimate choices that define personal identity and beliefs." *Obergefell v. Hodges*, 576 U.S. 644, 663 (2015) (citing *Eisenstadt v. Baird*, 405 U.S. 438 (1972); *Griswold v. Connecticut*, 381 U.S. 479 (1965)). This "fundamental 'right of privacy' implicit in the Fourteenth Amendment's Due Process Clause" includes, among other rights, "the right to marry," *Zablocki v. Redhail*, 434 U.S. 374, 384 (1978), because "the right to personal choice regarding marriage is inherent in the concept of individual autonomy," *Obergefell*, 576 U.S. at 665. More generally, the liberty protected by the Due Process Clause includes "the right to intimate association, the freedom to choose 'to enter into and maintain certain intimate human relationships.'" *Kipps v. Caillier*, 205 F.3d 203, 205 (5th Cir. 2000), *cert. denied*, 531 U.S. 816 (2000) (quoting *Roberts v. United States Jaycees*, 468 U.S. 609, 617-18 (1984)). "Supreme Court precedent with respect to intimate association can be synthesized as a continuum with 'family relationships' at one end, receiving the most protection, and arms length relationships, like a business acquaintance, at the other end[.]" *Id.* (quoting *Roberts*, 468 U.S. at 620).

Lewis's relationship with Doe and her children sits comfortably on the "family relationship" end of this spectrum. Though unmarried in the eyes of the State of Louisiana,[2] Lewis and Doe expressed their commitment to one another by cohabiting for many years—an arrangement that has provided "permanency and stability" for the children they raise together. *Obergefell*,

---

[2] Parties cannot enter into a common-law marriage in Louisiana, though common-law marriages validly formed elsewhere are recognized. *See Succession of Marinoni*, 177 La. 592, 610 (La. 1933); *State v. Williams*, 688 So.2d 1277, 1281 (La. App. 1997).

576 U.S. at 668 (citing the rearing of children, whether biological or not, as "a central premise" of marriage). Significantly, Smith forfeited any argument that Lewis and Doe's relationship is entitled to less constitutional protection than a marriage. Thus, I agree with my colleagues and the district court that Lewis's relationship with Doe must be analyzed as a "marriage-like" intimate association deserving of just as much protection under the Fourteenth Amendment as any official marriage. *Ante*, at 6.

Because, for present purposes, we analyze Lewis's and Doe's relationship as a "marriage," we must decide what level of scrutiny to apply to a condition of state employment that restricts an employee's right to marry. My colleagues apply rational basis review, reasoning that the STPSO did "not prohibit the relationship itself"; it merely "require[d] [Lewis] to relinquish [his] job." *Ante*, at 7.

In my view, a more searching inquiry is required. The majority's approach would create an anomaly in the law, whereby the right to marry is afforded less constitutional protection than other fundamental liberties. Courts apply heightened scrutiny—or, at least, some form of interest-balancing test—when a government employer burdens or retaliates against an employee because of his or her religious exercise,[3] speech or testimony on matters of public concern,[4] political activities,[5] educational decisions for his or her child,[6] or decision to breastfeed.[7] But when it comes to marriage—

---

[3] *Kennedy v. Bremerton School Dist.*, 142 S. Ct. 2407, 2421-23, 2426 (2022).

[4] *Pickering*, 391 U.S. at 568; *Reeves v. Claiborne Cty. Bd. of Educ.*, 828 F.2d 1096, 1099-1101 (5th Cir. 1987); *Bickel v. Burkhart*, 632 F.2d 1251, 1256-57 (5th Cir. Unit A 1980).

[5] *Brady v. Fort Bend County*, 145 F.3d 691, 706-710 (5th Cir. 1998).

[6] *Fyfe v. Curlee*, 902 F.2d 401, 404-06 (5th Cir. 1990), *cert. denied sub nom. Curlee v. Fyfe*, 498 U.S. 940 (1990); *Brantley v. Surles*, 718 F.2d 1354, 1359 (5th Cir. 1983).

[7] *Dike v. School Bd. of Orange Co., Fla.*, 650 F.2d 783 (5th Cir. Unit B 1981).

one of the most fundamental rights of all—the majority will do no more than ask whether the employment policy is rationally related to a conceivable legitimate objective, without balancing those objectives against the employee's profound liberty interests.    *Ante*, at 8.    This double standard relegates marriage to the status of a second-class right.    That cannot be.    *See Obergefell*, 576 U.S. at 666 ("[I]t would be contradictory 'to recognize a right of privacy with respect to other matters of family life and not with respect to the decision to enter the relationship that is the foundation of the family in our society.'") (quoting *Zablocki*, 434 U.S. at 386); *Zablocki*, 434 U.S. at 384 ("[T]he right 'to marry, establish a home and bring up children' is a central part of the liberty protected by the Due Process Clause") (quoting *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923)); *Loving v. Virginia*, 388 U.S. 1, 12 (1967) ("Marriage is one of the 'basic civil rights of man,' fundamental to our very existence and survival") (quoting *Skinner v. State of Okl. ex rel. Williamson*, 316 U.S. 535, 541 (1942)); *Griswold*, 381 U.S. at 486 ("Marriage is a coming together for better or worse, hopefully enduring, and intimate to the degree of being sacred. … [I]t is an association for as noble a purpose as any involved in our prior decisions.").

In applying rational basis review, the majority purports to follow the Supreme Court's directive in *Zablocki* that "reasonable regulations that do not significantly interfere with decisions to enter into the marital relationship may legitimately be imposed."    434 U.S. at 386.    But this proposition does not tell us much—only that there are *some* regulations whose effect on marriage is so incidental that they are not constitutionally suspect.    What might such a regulation actually look like?    *Zablocki* offered just one example: the Social Security Act provision in *Califano v. Jobst*, 434 U.S. 47 (1977), under which benefits could be terminated if a beneficiary married someone who was not eligible for benefits.    *See Zablocki*, 434 U.S. at 386 (citing *Jobst*, *supra*).    That is a far cry from the outright loss of livelihood that accompanies

one's loss of employment. The critical difference between *Jobst* and this case is that the statutory withdrawal of Social Security benefits in *Jobst* was not *designed* to discourage anyone from marrying. Instead, as the Court explained, it was an acknowledgment—grounded in "[b]oth tradition and common experience"—that when a person eligible for Social Security marries one who is not eligible, it will usually (but not always) correspond to an improvement in that person's station. 434 U.S. at 53–54 ("[I]t was rational for Congress to assume that marital status is a relevant test of probable dependency[.]"). Here, by contrast, the fraternization policy is specifically intended to prohibit certain intimate associations (including marriages) among STPSO employees. Indeed, that is the only conceivable objective of the policy.

This case is closer to *Zablocki* itself than it is to *Jobst*. In *Zablocki*, the Court struck down a Wisconsin statute requiring those with outstanding child support obligations to seek court permission to marry. *See* 434 U.S. at 375. Such permission could only be granted if the applicant proved that they were in compliance with the support obligation and that the children covered by the support obligation were not likely to become "public charges." *Id.* Like the fraternization policy here, the *purpose* of the statute in *Zablocki* was to prevent some people from marrying. Distinguishing *Jobst*, the Court explained that Wisconsin's statute "interfere[d] directly and substantially with the right to marry." *Id.* at 387. The Court acknowledged that some individuals would be able "to meet the statute's requirements." *Id.* Those individuals, however, would still "suffer a serious intrusion into their freedom of choice in an area"—marriage—"in which we have held such freedom to be fundamental." *Id.*

That logic ought to control here. If merely being required to pay off one's *existing* child support obligations amounts to a "direct[] and substantial[]" interference triggering heightened scrutiny, then why would

that not also be true for the threatened loss of a job?  The latter is typically much more financially catastrophic than the former.

The majority also cites with approval a passage from the district court's opinion that the STPSO's fraternization policy "does not place a 'direct and substantial' burden on the right to intimate relationships because it does not completely prohibit one class of people from being with another." *Ante*, at 7.  In a similar vein, Sheriff Smith argues that "Government action is deemed to have 'direct and substantial' burdens on intimate association only where *a large portion of those affected by the rule* are absolutely or largely prevented from forming intimate associations, or where those affected by the rule are absolutely or largely prevented from forming intimate associations *with a large portion of the otherwise eligible population* of people with whom they could form intimate associations."  Appellee Br., Dkt No. 27, at 15-16 (quoting *Beecham v. Henderson Cty., Tenn.*, 422 F.3d 372, 376 (6th Cir. 2005). (emphases added; brackets omitted)).  Smith, the district court, and my colleagues all seem to imply that a policy preventing an employee from marrying a specific person or a small number of people need not be strictly scrutinized—presumably, because there would remain a "class" or "large portion of the otherwise eligible population" available to marry.

In my view, this population-centric approach demeans the "bilateral loyalty" that lies at the core of marriage.  *Griswold*, 381 U.S. at 486.  It is no more correct to say that Lewis was not substantially burdened because he could marry a person without a felony record instead of Doe, than it would be to say that Richard Loving was not substantially burdened because he could have married a white woman instead of Mildred Loving, or that James Obergefell was not substantially burdened because he could have married a woman instead of John Arthur.  *See Obergefell*, 576 U.S. at 658; *Loving*, 388

U.S. at 12.[8]  Freedom to marry is inseparable from the freedom to choose *whom* to marry.  *See Obergefell*, 576 U.S. at 667 ("The right to marry … dignifies couples who 'wish to define themselves by their commitment to each other.'") (quoting *United States v. Windsor*, 570 U.S. 744, 763 (2013)); *Riker v. Lemmon*, 798 F.3d 546, 555-56 (7th Cir. 2015) ("The right to marry includes the right to select one's spouse.  The proper inquiry, therefore, is whether [the plaintiff] was prohibited from marrying the spouse of her choosing.") (internal citations and footnote omitted).  Our role as a court is not to evaluate Lewis's selection of a romantic partner, but only to assure that it receives the constitutional protection it is due.

For these reasons, I believe Lewis's official-capacity claim against Smith for violating his right to intimate association must be analyzed under heightened scrutiny.  I express no view as to whether the STPSO's actions could ultimately satisfy this form of scrutiny.  The interests identified by the district court—"preventing [the STPSO's] officers from placing themselves in compromising positions" and "preserving the STPSO's reputation in the public and in the law enforcement community"—are certainly important.  Whether the fraternization policy, as applied to Lewis, is sufficiently tailored to those interests is a closer question that would require further factual development to answer.  Because this case is still at the pleadings stage, I would hold that the district court erred in dismissing this claim.

---

[8] I do not mean to imply that the STPSO's fraternization policy is as egregiously unconstitutional as the laws that were struck down in *Loving* and *Obergefell*.   I mean only to illustrate that, when the state prevents an individual from marrying his or her chosen spouse, it is no answer to say that he or she might theoretically be able to marry someone else.

## II.

In addition to his intimate-association claim, Lewis alleged that the STPSO selectively enforced its own policy and discriminated against Lewis because of his race.  The district court dismissed this claim on the supposed ground that Lewis failed to plead the identities, positions/ranks, and races of other STPSO employees against whom the fraternization policy was not enforced.  But in doing so, the court ignored (and thereby constructively denied) Lewis's request to amend the complaint to provide "the identity and race of the other persons that are in violation of the policies but have not been terminated."  In other words, the court deprived Lewis of an opportunity to cure the very defect upon which it dismissed his complaint.  I would hold that this was error.

"Leave to amend is not automatic, but a district court needs a substantial reason to deny a party's request for leave to amend."  *N. Cypress Med. Ctr. Operating Co., Limited v. Aetna Life Ins. Co.*, 898 F.3d 461, 477 (5th Cir. 2018) (internal quotation marks omitted) (quoting *Marucci Sports, L.L.C. v. Nat'l Collegiate Athletic Ass'n*, 751 F.3d 368, 378 (5th Cir. 2014)).  Here, the district court articulated no reasons, substantial or otherwise.  It simply dismissed the complaint without so much as addressing Lewis's request—a practice disapproved by our Court.  *See id.* at 478 ("In light of the presumption in favor of allowing pleading amendments, courts of appeals routinely hold that a district court's failure to provide an adequate explanation to support its denial of leave to amend justifies reversal.  This court has a strong preference for *explicit* reasons[.]") (emphasis in original; internal quotation marks omitted) (quoting *Mayeux v. Louisiana Health Service and Indem. Co.*, 376 F.3d 420, 426 (5th Cir. 2004)).

Adding insult to injury, the court faulted Lewis for failing to provide the very information that he sought to add to his amended complaint.  In

connection with his request, Lewis stated that he knew of at least six other STPSO employees who had a relationship or association with a known felon and that Smith himself hired a felon as an Administrative Assistant. As Lewis explained, he omitted this information in his original complaint "to protect the privacy of the third parties at issue." He should not now be penalized for that good-faith (if perhaps unnecessary) gesture. "The Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome." *Foman v. Davis*, 371 U.S. 178, 181-82 (1962).

I am at a loss to understand why the district court declined to take the small step of allowing Lewis to supply this information, or why the majority blesses that decision here. My colleagues' reliance on *Scott v. U.S. Bank Nat'l Ass'n*, 16 F.4th 1204 (5th Cir. 2021), is, in my view, misguided. There, the plaintiff's request stated in full: "Plaintiff asserts that his original complaint is sufficient to state a claim and should survive Defendant's 12(b)(6) motion. Should this Court disagree, Plaintiff requests the opportunity to amend his complaint in accordance with the federal and local rules." *Id.* at 1209. A district court does not abuse its discretion when it denies a boilerplate request like the one in *Scott*, because such requests provide insufficient detail for the court to determine whether an amendment would be futile. Here, by contrast, Lewis articulated the type of information that he wished to provide, and gave a wholly innocent reason for his failure to present it in his original complaint.

A plaintiff asserting race discrimination should freely be given leave to plead the identities and races of his comparators. In this case, there is no dispute that Lewis could have stated a *prima facie* claim of racial discrimination by alleging that there were comparable, non-black employees of the STPSO who violated the fraternization policy yet were not terminated. Indeed, this information was so crucial to his selective-enforcement claim

No. 19-30689

that denying him an opportunity to plead it was tantamount to a refusal by the district court to evaluate his claim on the merits at all.  This was an abuse of discretion.  "Rule 15(a) declares that leave to amend 'shall be freely given when justice so requires'; this mandate is to be heeded."  *Foman*, 371 U.S. at 182.

\* \* \*

For these reasons, I respectfully dissent in part.